# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**KENDALL SUMMERS**

**CIVIL ACTION**

**VERSUS**

**NO. 20-21-JWD-SDJ**

**STATE OF LOUISIANA, LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS, as the political entity responsible for Eastern Louisiana Mental Health System, ET AL.**

## CONSOLIDATED WITH

**STORM ERIE, ET AL.**

**CIVIL ACTION**

**VERSUS**

**NO. 20-289-JWD-SDJ**

**STATE OF LOUISIANA, LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS, as the political entity responsible for Eastern Louisiana Mental Health System, ET AL.**

## CONSOLIDATED WITH

**IVORY AMOS, ET AL.**

**CIVIL ACTION**

**VERSUS**

**NO. 20-386-JWD-SDJ**

**STATE OF LOUISIANA, LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS, as the political entity responsible for Eastern Louisiana Mental Health System, ET AL.**

## CONSOLIDATED WITH

**CHRISTOPHER CAMPBELL, ET AL.**

**CIVIL ACTION**

**VERSUS**

**NO. 20-580-JWD-SDJ**

**STATE OF LOUISIANA, LOUISIANA DEPARTMENT OF HEALTH AND**

**HOSPITALS, as the political entity
responsible for Eastern Louisiana
Mental Health System, ET AL.**

## RULING AND ORDER

This matter comes before the Court on the *Superseding Motion to Dismiss All Cases for Lack of Subject Matter Jurisdiction and Failure to State a Cause of Action* (Doc. 57) ("*Motion*") filed by Defendants, State of Louisiana, through the Department of Health ("LDH" or "LDOH"), and Courtney N. Phillips, the Secretary of the Louisiana Department of Health (collectively, "Defendants"). Plaintiffs Kendall Summers, Storm Erie, Glenn Stelly, Ivory Amos, Kirby Robinson, Christopher Campbell, Trevor McInnis, and Christopher Ryan Smith ("Plaintiffs") oppose the *Motion*. (Doc. 64.) Defendants did not file a rely. Oral argument is not necessary. The Court has carefully considered the law, facts in the record, and arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendants' *Motion* is GRANTED but Plaintiffs are given leave to amend their complaints.

## I.  BACKGROUND AND ALLEGATIONS OF PLAINTIFFS

Plaintiffs in these consolidated cases are all committed to the East Louisiana Mental Health System ("ELMHS") per court order entered in connection with ongoing judicial proceedings. The eight Plaintiffs have filed four substantially identical lawsuits, which have been consolidated for all purposes except trial. (*Summers*, Docket Number 20-21, Doc. 53.) Plaintiff Summers was granted leave to amend his complaint to make the allegations consistent with those made by the other plaintiffs in the consolidated cases (*id.*, Doc. 55), after which amended complaint (*id.*, Doc. 56), all four consolidated cases have consistent operative complaints. (See *Summers*, 20-21, Doc. 56; *Erie*, 20-289, Doc. 28; *Amos*, 20-386, Doc. 14; *Campbell*, 20-580, Doc. 15.)[1] For reasons of

---

[1] For convenience, in referring to each of the four cases, the Court will not repeat the docket numbers but merely refer only to the lead Plaintiff and record document number.

judicial efficiency and clarity of the record, previous motions to dismiss in the four cases were dismissed without prejudice and Defendants were permitted to file a single motion to dismiss the consolidated cases. (Doc. 55 at 2.)

All Plaintiffs file suit under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* ("RA"), and the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116, *et seq.* ("ACA"). (*Summers,* Doc. 56 at 2; *id.* at 3, ¶ 1; *Erie*, Doc. 28 at 2-3; *id.* at 3, ¶ 1; *Amos*, Doc. 14 at 2-3; *id.* at 3, ¶ 1; *Campbell*, Doc. 15 at 2-3; *id.* at 3, ¶ 1.) With the exception of Plaintiffs Robinson and McInnis, all Plaintiffs have mental illness and are committed to ELMHS pursuant to Louisiana Code of Criminal Procedure Article 657 by virtue of having been adjudicated Not Guilty by Reason of Insanity ("NGRI"). (*Summers*, Doc. 56, ¶¶ 74-84; *Erie*, Doc. 28, ¶ 15; *Amos*, Doc. 14, ¶ 15; *Campbell*, Doc. 15, ¶ 20.)

Robinson alleges he was found to be "irrestorably incompetent to stand trial pursuant to *Lockhart v. Armstead*, 351 So. 2d 496 (1977)." (*Amos*, Doc. 14, ¶ 15.)[2] McInnis alleges he has not been adjudged NGRI and is a pre-trial detainee. (*Campbell*, Doc. 15, ¶ 20.) He claims that he has cerebral palsy/spastic palsy and has difficulty walking and standing. (*Id*., ¶¶ 93.) However, Robinson's and McInnis' allegations in their operative complaints and arguments made in Plaintiffs' opposition to the *Motion* are in essential respects identical to those made on behalf of the other Plaintiffs, and Plaintiffs do not argue that the non-NGRI status of Robinson and McInnis requires that they be treated differently from the other Plaintiffs.

---

[2] Defendants state: "Robinson alleges he has been determined by a court to be incompetent to stand trial pursuant to La. [Code Crim. Proc. art.] 647 and is subject to the procedure set out in La. [Code Crim. Proc. art.] 648. In light of La. [Code Crim. Proc. art.] 648(B), it is likely that Mr. Robinson is actually committed to ELMHS on a civil judicial commitment pursuant to La. R.S. 28:54." (Doc. 57-1 at 4.)

All Plaintiffs allege that they are "qualified individuals" with a disability under the ADA, RA, and ACA by virtue of their mental conditions. (*Summers*, Doc. 56, ¶ 5; *Erie*, Doc. 28, ¶¶ 4, 9; *Amos*, Doc. 14, ¶¶ 6, 9; *Campbell*, Doc. 15, ¶¶ 4, 9, 11, 14, 16.) Defendants concede that "Plaintiffs' court-ordered commitments to ELMHS indicate that their conditions cause substantial limitations. Thus, Defendants accept for purposes of the instant motion, that Plaintiffs have qualifying disabilities." (Doc. 57-1 at 4.)

According to Plaintiffs, a "treatment professional" has recommended Stelly, Erie, Amos Robinson and Campbell "for community-based treatment *in the past*." (*Erie*, Doc. 28, ¶¶ 7, 12; *Amos*, Doc. 14, ¶¶ 7, 12; *Campbell*, Doc. 15, ¶ 7 (emphasis added); *see also Summers*, Doc. 56, ¶¶ 73-88, recounting Summers' prior releases from ELMHS.) There is no similar allegation for McInnis and Smith. None of the Plaintiffs allege that a treatment professional has made a current recommendation for their release from ELMHS, conditional or otherwise, or for their participation in community-based treatment. However, all Plaintiffs except Summers allege that "[e]ven if [Plaintiff] does not have a current recommendation for community-based placement, his individual needs are not static and he will likely obtain a recommendation for community-based treatment in the future." (*Erie*, Doc. 28, ¶¶ 7, 12; *Amos*, Doc. 14, ¶¶ 7, 12; *Campbell*, Doc. 15, ¶¶ 7, 12, 17.)

Summers' allegations are more detailed. On June 17, 2003, Summers was charged by the State of Louisiana with attempted second-degree murder. (*Summers*, Doc. 56, ¶ 73.) Plaintiff was found NGRI on that charge and was committed to ELMHS for treatment on August 26, 2004. (*Id.* ¶ 74.) According to Summers, "[t]hrough inpatient treatment, Mr. Summers was able to overcome his psychiatric impairment, which is presently in remission." (*Id.* ¶ 75.)

Subsequently, on March 17, 2011, a mental competency hearing was held. (*Id.* ¶ 76.) Dr. Joseph Bolton, Summers's treating doctor at ELMHS, was subject to direct examination and cross

examination. (*Id.*) Another mental competency hearing was held on March 31, 2011, which resulted in the court finding Summers was "NOT DANGEROUS". (*Id.* ¶ 77.) Summers further alleges that:

> based on "a finding that he doesn't have a mental illness or mental defect at this time", the Court ordered Mr. Summers released from ELMHS on conditional release, to participate in a Forensic Aftercare program. Essentially, even though he was never convicted of a crime and no longer had an active disability, Mr. Summers was subjected to probation.

(*Id.* ¶ 78.)

However, on July 20, 2011, Summers was arrested for "purportedly violating the terms of his probation [and] was taken back to ELMHS." (*Id.* ¶ 80.) Summers was again ordered to be released from ELMHS on September 5, 2014; however, he was taken back after a positive drug test caused by Summers' psychiatric medications. (*Id.* ¶¶ 81-84.)  On March 22, 2018, Summers was once again ordered to be released from ELMHS, but one week after his release his probation was revoked, and he was taken back to ELMHS. (*Id.* ¶¶ 86-87.) Since then, Summers has not been released nor has an out-patient treatment program been provided for him. (*Id.* ¶ 88.)

Summers alleges that he

> will likely not receive a court recommendation for placement in a less restrictive environment until he has been observed in a supervised setting. However, the LDOH practice of housing all forensic patients at ELMHS rather than complying with their obligations for Community Based Integration will make this recommendation very difficult to obtain. ***

(*Summers*, Doc. 56, ¶ 61.)

### 1. Request for Reasonable Accommodation

Prior to filing suit, Plaintiffs' counsel sent a request for reasonable accommodation/modification to the LDOH on behalf of Plaintiffs. (*Summers*, Doc. 56, ¶¶ 92-94; *Erie*, Doc. 28, ¶¶ 90-93; *Amos*, Doc. 14, ¶¶ 90-93; *Campbell*, Doc. 15, ¶¶ 103-105, 108-109, 113-

115.)   In this letter, Plaintiffs' counsel explained the nature of Plaintiffs' disability, their limitations, and their needed accommodations. (*Id.*)   Plaintiffs' requested accommodations included adequate funding of the LDOH, the development of an outpatient treatment program, training of the LDOH staff on accommodating patients with disabilities, and the ongoing assessment of Plaintiffs' needs as individuals with a disability. For all Plaintiffs except Smith, Plaintiffs asked for release from ELMHS "while the above comprehensive outpatient treatment program is being developed." (*Id.*)[3]

In the case of Summers, Erie, and Stelly, Defendants did not respond to this request for reasonable accommodation. (*Summers,* Doc. 56, ¶ 95; *Erie*, Doc. 28, ¶ 94.)  In the case of Amos, Robinson, Campbell, McInnis, and Smith, counsel for LDH responded by saying "Because [they are] currently in the least restrictive, most medically suitable environment per [their] treating psychiatrist[s], the accommodations requested are not appropriate at this time." (*Amos*, Doc. 14, ¶ 93; *Campbell*, Doc. 15, ¶¶ 106, 110, 116.)  Defendants have also made no attempt to engage in a good-faith, interactive dialogue with Plaintiffs through their counsel of record. (*Summers*, Doc. 56, ¶ 108; *Erie*, Doc. 28, ¶ 105; *Amos*, Doc. 14, ¶ 104; *Campbell*, Doc. 15, ¶ 130.)

### 2. Examples of Non-Compliance

According to the operative complaints:

Instead of developing a comprehensive system to provide Community Based Integration, the LDOH has chosen to warehouse individuals with mental disabilities—and individuals who no longer have mental disabilities—at ELMHS.

The LDOH's choice to warehouse individuals with disabilities at the ELMHS instead of developing a comprehensive outpatient treatment system violates Title II of the ADA.

---

[3] As is covered in more detail elsewhere in this ruling, Plaintiffs do not repeat this request for release from ELMHS in the body or prayer of their respective complaints. Indeed, they affirmatively state that they "do[ ] not ask for release or seek the entitlement to such relief. Instead [they] seek[ ] for Defendants to be Ordered to comply with the ADA/RA/ACA, which would merely enhance [Plaintiffs'] eligibility for accelerated release from ELMHS." (*Summers*, Doc. 56, ¶ 100; *Erie*, Doc. 28, ¶ 96; *Amos*, Doc. 14, ¶ 95; *Campbell*, Doc. 15, ¶ 118.)

(*Summers*, Doc. 56*, ¶¶ 38-39; *Erie*, Doc. 28, ¶¶ 46-47; *Amos*, Doc. 14, ¶¶ 46-47; *Campbell*, Doc. 15, ¶¶ 51-52.)

Indeed, those like Plaintiffs, institutionalized in mental health facilities, "must be given the opportunity to receive services in the most integrated setting appropriate to their needs" and "must be afforded meaningful community placement options" by way of the ADA's integration mandate. (*Summers*, Doc. 56 at 1; *Erie*, Doc 28 at 1; *Amos*, Doc. 14 at 1; *Campbell*, Doc. 15 at 1, citing *Olmstead v. L.C.*, 527 U.S. 581 (1999).)

Plaintiffs allege they have been denied access to community services and programs because they have been improperly warehoused at ELMHS. Specifically, Plaintiff alleges that they have been denied equivalent educational opportunities that are available to non-disabled individuals who reside in the community. (*Id.*, *Summers,* ¶ 40-41; *Erie*, ¶ 48; *Amos*, ¶ 48; *Campbell*, ¶ 53.) "Upon information and belief, at the ELMHS, there are no college courses or advanced study opportunities for individuals" like Plaintiffs.

> In contrast, individuals residing in the community can take classes through in person enrollment at a university, online study, etc. By failing to provide meaningful community-based housing and integration opportunities to individuals with disabilities such as MR. SUMMERS, Defendants have failed to provide equivalent educational opportunities to individuals with disabilities who happen to be confined at ELMHS.

(*Id.*, *Summers*, ¶ 41; *Erie*, ¶ 49; *Amos*, ¶ 49; *Campbell*, ¶ 54.)

Furthermore, Plaintiffs "have significantly limited freedom of movement" and, if provided with Community Based Integration, "could engage in [their] own, private recreation with greater frequency and regularity." (*Id.*, *Summers*, ¶ 42, *Erie*, 50; *Amos*, ¶ 50; *Campbell*, ¶ 55.) Plaintiffs allege that their opportunity to exercise at ELMHS is also limited which could be improved with

Community Based Integration (sometimes referred to as "CBI"). (*Id.*, *Summers*, ¶ 44; *Erie*, ¶ 52; *Amos*, ¶ 52; *Campbell*, ¶ 57.)

### B. Claims and Prayer for Relief

Based on the foregoing, Plaintiffs allege that Defendants violated (1) Title II of the ADA, (2) Section 504 of the RA, and (3) Section 1557 of the ACA. (*See generally*, *Summers*, Doc. 56 at 2; *Erie*, Doc. 28 at 2-3; *Amos*, Doc 14 at 2-3; *Campbell*, Doc. 15 at 2-3.) More specific allegations under each statute are found as follows: *Summers*, Doc. 56: ADA, ¶¶ 15-123; RA, ¶¶ 124-132; ACA, ¶¶ 133-142; *Erie*, Doc. 28: ADA, ¶¶ 23-120; RA, ¶¶ 121-130; ACA, ¶¶ 130-140; *Amos*, Doc. 14: ADA, ¶¶ 23-118; RA, ¶¶ 119-128; ACA, ¶¶ 129-138; *Campbell*, Doc. 15: ADA, ¶¶ 28-146; RA, ¶¶ 147-156; ACA, ¶¶ 157-167. Plaintiffs' claims under the RA and ACA mirror their claims brought under the ADA. (*Summers*, Doc. 56, ¶¶ 124, 131, 133, 140; *Erie*, Doc. 28, ¶¶121, 129, 131, 138; *Amos*, Doc. 14, ¶¶ 119, 127, 129, 136; *Campbell*, Doc. 15, ¶¶ 147, 155, 157, 165.)

Generally, Plaintiffs allege that Defendants violated the ADA by failing to make reasonable modifications in their policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, primarily in the form of developing and implementing a plan of CBI. (Doc. 64 at 22-27.) By failing to provide and administer services, programs, and activities to Plaintiffs in the most integrated setting appropriate to the needs of qualified individuals with disabilities, Defendants violated the RA and the ADA, since it subjected qualified individuals to discrimination on the basis of disability. (*Id.*)

Because LDH was aware of the need for these accommodations and modifications both as a result of the acknowledged failures of ELHMS as well as Plaintiffs' requests for reasonable accommodations and modifications, Defendants' failure to make the needed changes was intentional. (*Id.* at 27-29.) Plaintiffs also allege that Defendants violated the "program access"

8

requirement of the RA and the ADA by failing to operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. (*Id.* at 29-30.)

Notably, "[b]y and through this action, [Plaintiffs] do[ ] not ask for release [from ELMHS] or seek the entitlement of such relief. Instead, [Plaintiffs] seek[ ]for Defendants to be Ordered to comply with the ADA/RA/ACA which would merely enhance [Plaintiffs'] eligibility for accelerated release from ELMHS." (*Summers*, Doc. 56, ¶ 100; *Erie*, Doc. 28, ¶ 96; *Amos*, Doc. 14, ¶ 95; *Campbell*, Doc. 15, ¶ 118.)  Plaintiffs pray for the following injunctive relief:

a. This Court order Defendants to develop and provide a [comprehensive outpatient treatment program] for individuals with disabilities.

b. This Court order Defendants to assess what reasonable accommodation and auxiliary aids/services [Plaintiffs] may need to function in an outpatient bases (e.g., personal assistant, medications, etc.) and to ensure that [Plaintiffs are] provided these reasonable accommodation and auxiliary aids/services on a consistent and regular basis.

c. This Court order Defendants to maintain adequate funding of the above system.

d. This Court order[] Defendants to provide adequate training to the Louisiana Department of Health staff on accommodating individuals with disabilities, including psychiatric disabilities.

e. This Court order Defendants to provide ongoing assessment of [Plaintiffs'] needs as a person with a disability.

f. This Court order Defendants to provide [Plaintiffs] with ability to access educational opportunities equivalent to those available to non-disabled individuals who do not reside at ELMHS.[4]

(*Summers*, Doc. 56 at 26-27; *Erie*, Doc. 28 at 25-26; *Amos*, Doc. 14 at 25-26; *Campbell*, Doc. 15 at 30-31.)

---

[4] Plaintiffs clarify this demand in briefing: "Plaintiffs are not demanding that the LDH provide Plaintiffs with educational and recreational programs[;] instead, they allege that LDH's practice of housing all individuals who have been found NGRI at ELMHS instead of having a system of community based treatment forecloses Plaintiffs' access to these opportunities within the community." (Doc. 64 at 5. *See also*, to the same effect, *id.* at 30.)

Plaintiffs also seek an award of monetary damages, attorneys' fees, costs, and any "other relief as the Court deems just and proper." (*Id.*, *Summers* at 26-27; *Erie*, at 25-26; *Amos*, at 25-26; *Campbell*, at 30-31.)

## II.    RELEVANT STANDARDS

### A.  Rule 12(b)(1)

Concerning the standard for Rule 12(b)(1) motions, the Fifth Circuit has explained:

> Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case. Fed. R. Civ. P. 12(b)(1). Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Barrera–Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir. 1996).

> The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. *McDaniel v. United States,* 899 F. Supp. 305, 307 (E.D. Tex. 1995). Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist. *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir. 1980).

> When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Hitt v. City of Pasadena,* 561 F.2d 606, 608 (5th Cir. 1977) (per curiam). . . .

> In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute. *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir. 1981). Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief. *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.,* 143 F.3d 1006, 1010 (5th Cir. 1998).

*Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

### B.  Rule 12(b)(6)

"Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a

complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand, supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-00177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

In deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03

(5th Cir. 2014).  The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted. *Id.* at 503.

## III.    ARGUMENTS OF THE PARTIES

### A.  Defendants' *Motion* and Supporting Memorandum (Docs. 57 and 57-1)

Defendants' *Motion* seeks dismissal on the grounds that: (1) the Court lacks jurisdiction over Plaintiffs' claims because Plaintiffs lack standing; (2) Plaintiffs' claims are barred by the *Younger* abstention doctrine; and (3) Plaintiffs' claims fail to state a claim upon which relief can be granted. (Doc. 57.)

### 1. Plaintiffs Lacks Standing

Defendants argue first that because Plaintiffs have been removed and separated from their communities by "court order entered with due process [ ] and are subject to ongoing state proceedings" (Doc. 57-1 at 9), their institutionalization is not "unjustified" or "undue", which is the foundation of the *Olmstead* claim being made by Plaintiffs (*id.*, citing *Olmstead*, 527 U.S. at 597). Thus, Plaintiffs have not suffered an invasion of a concrete and particularized legally protected interest, which invasion is actual or imminent rather than conjectural or hypothetical. (*Id.*, citing *Spokeo, Inc. v. Robinson,* 578 U.S. 330, 339 (2016).)

Defendants note that while some of the Plaintiffs have been recommended for community-based treatment in the past, none of them are alleged to have current recommendations. (*Id.* at 10.) Plaintiffs' allegations that "they will likely obtain a recommendation for community-based treatment in the future" are conclusory, abstract, hypothetical, speculative, and totally unsupported by any facts. (*Id.*)

Defendants next maintain that Plaintiffs lack standing to sue for money damages because they "have not sustained a *past* injury-in-fact that is fairly traceable to the conduct of Defendants,"

a requirement for standing. (*Id*. at 10-11, citing *Delta Com. Fisheries, Ass'n v. Gulf of Mexico Fishery Mgmt. Council*, 259 F. Supp. 2d 511, 514-15 (E.D. La. 2003), *aff'd*, 364 F.3d 269 (5th Cir. 2004) (quoting *Lujan,* 504 U.S. at 560).) "Courts of the State of Louisiana removed the Plaintiffs from their communities and have exclusive jurisdiction to return the Plaintiffs to those communities." (*Id*. at 11.)

Defendants argue finally that Plaintiffs lack standing to seek injunctive relief because they have failed to show that it is " 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " (*Id*. at 11, quoting *Lujan*, 504 U.S. at 560-61.) Plaintiffs have not alleged they have been recommended for community-based treatment and their allegations that "they will likely obtain a recommendation for community-based treatment in the future" are, again, unsupported by any facts and are merely speculative. Thus, they fail to show "how a favorable ruling on their claims for declaratory and injunctive relief will likely redress their alleged injuries." (*Id*. at 12.)

### 2. *Younger* Abstention Applies

Defendants next argue alternatively that this Court should abstain from exercising jurisdiction over Plaintiffs' injunctive relief claims pursuant to *Younger v. Harris*, 401 U.S. 37 (1971). Defendants contend that *Younger* abstention applies if the following three requirements are met: (1) the federal proceeding would interfere with an ongoing state judicial proceeding; (2) the state has an important interest in regulating the subject matter of the claim; and (3) the plaintiffs have an adequate opportunity in the state proceedings to raise constitutional challenges. (Doc. 57-1 at 13, citing *Bice v. Louisiana Pub. Def. Bd.*, 677 F.3d 712, 716 (5th Cir. 2012).)

In this case, the first factor is met because any injunction compelling Plaintiffs' release from ELHMS would interfere with the ongoing judicial proceedings pertaining to their judicially

imposed commitment. (*Id*.)  In support, Defendants emphasize that Plaintiffs were committed to ELMHS pursuant to La. Code Crim. Proc. art. 654 and can only be released by the court that originally ordered that commitment. (*Id*. at 13, n.30, citing La. Code Crim. Proc. art. 654 ("*If the Court determines* that the defendant can be discharged…").)[5] Additionally, it is the role of the presiding criminal judge to determine whether outpatient treatment is appropriate—not the LDOH. (*Id*., citing La. Code Crim. Proc. arts. 657, 658.)  Moreover, Plaintiffs' request for injunctive relief usurps the state courts' ability to oversee their commitments, and "would not only prohibit the state judges from conducting a full evidentiary hearing and evaluation of the relevant evidence, but would deprive them of their discretion to prepare and implement appropriate conditions of discharge and/or probation." (*Id*. at 14.)

As to the second *Younger* element, Defendants contend that the State's interests in the proceedings governing the commitment of NGRI acquittees are well-established, as acknowledged by this Court in *George v. Louisiana Dep't of Pub. Safety & Corr.*, 272 F. Supp. 3d 855, 885 (M.D. La. 2017) (deGravelles, J.). (*Id*. at 14-15.) Thus, according to Defendants, it cannot be disputed that the State has a compelling interest in not only ensuring that NGRI acquittees receive all of the judicial processes to which they are entitled but also that they are not released from treatment before it is determined that their release is safe. (*Id*. at 15.)

---

[5] Defendants correctly note that Robinson is not alleged to be NGRI but rather is alleged to have been committed to ELMHS by virtue of a finding of incompetency to stand trial. (Doc. 57-1 at 4.) Defendants conclude that Robinson was declared incompetent to stand trial "pursuant to La. [Code Crim. Proc. art.] 647 and is subject to the procedure in La. [Code Crim. Proc. art.] 648" and "it is likely that Mr. Robinson is actually committed to ELMHS on a civil judicial commitment pursuant to La. R.S. 28:54." (*Id*.) In his complaint, Robinson alleges he was found "irrestorably incompetent to stand trial pursuant to *Lockhart v. Armstead*, 351 So. 2d 496 (1977)." (*Amos*, Doc. 14, ¶ 15.) Defendants correctly state that "Nonetheless, Plaintiffs do not contend that Mr. Robinson's civil commitment should be treated any differently that the others' NGRI commitments." (Doc. 57-1 at 4-5.) Defendants do not separately mention Plaintiff McInnis, who alleges he has not been adjudged NGRI and is a pre-trial detainee. (*Campbell*, Doc. 15, ¶ 20.) Plaintiffs do not contend that McInnis' status as such entitles him to different treatment from the NGRI Plaintiffs.

As to the third *Younger* element, Defendants aver that the procedures in place under the Louisiana Code of Criminal Procedure for evidentiary hearings provide Plaintiffs "ample opportunity" to argue they should be ordered to community-based housing, rather than continued detention at ELMHS. (*Id.* at 14.)  Since all three *Younger* requirements are met, Defendants conclude that the Court should abstain from exercising jurisdiction over this case.

### 3. Failure to State a Claim

#### i. *Olmstead* Violation

Defendants contend that *Olmstead* only applies to avoid *undue* or *unjustified* institutionalization. (*Id.* at 9, emphasis by Defendants.) Since Plaintiffs were committed to ELMHS by a state court after a hearing, Plaintiffs' institutionalization is neither undue or unjustified. (*Id.*) Further Plaintiffs have failed to allege they even qualify for community integrated treatment at this time and thus have not stated a claim under the ADA, RA, or ACA. (*Id.*)

#### ii. Failure to Respond Favorably to Plaintiffs' Requests for Accommodation

Defendants maintain that Plaintiffs' " 'purported requests for accommodation' are not individualized requests for accommodation of particular limitations" but are broad requests for "development and funding of the undefined system of 'comprehensive Community Based Integration'…" (*Id.* at 16.) Furthermore, each of these requests ask for the release of Plaintiffs from ELMHS until such system is developed and funded. (*Id.*) It is Plaintiffs' burden to show that the requests were reasonable and, if granted, "would rectify the problem which he perceives." (*Id.* at 16-17, quoting *Bailey v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist.*, 484 F. Supp. 3d 346, 428 (E.D. La. 2020) (internal citation omitted).) Because Defendants have no power to release Plaintiffs and because Plaintiffs have not sufficiently alleged that Plaintiffs would qualify for the community-based program they are asked to develop, the accommodation request

is unreasonable. Thus, Defendants' failure to respond and/or meet Plaintiffs' demands cannot give rise to a cause of action under the ADA, RA, or ACA. (*Id*. at 18-19.) Summarizing, Defendants insist that:

> … Plaintiffs' requests are "defective from the outset" in that they do not identify Plaintiffs' impairments or limitations therefrom. The ADA requires the State [to] accommodate the limitations arising from a disability, and not the disability itself. Further, the requests were not reasonable, particularly the request that Plaintiffs be released pending the development and implementation of the comprehensive system when Defendants have no power under the law to do so.

(*Id*. at 17-18.)

### iii.    Intentional Discrimination

In order to recover compensatory damages under the ADA, Plaintiffs must prove Defendants' intentional discrimination. (Doc. 57-1 at 19, citations omitted.) Defendants argue that intent as defined in *Francois v. Our Lady of the Lake Hospital, Inc*., 8 F.4th 370, 379 (5th Cir 2021), has not been sufficiently alleged since each of the allegations regarding intentional conduct are conclusory and unsupported by factual allegations. (*Id*. at 19-20.) Because Plaintiffs' requests of accommodation were unreasonable, Defendants' failure to respond and/or provide the requested accommodations cannot be considered intentional discrimination. (*Id*. at 20.)

### iv.    Program Access

Here, Defendants respond to Plaintiffs' claims that "LDOH has failed to provide [Plaintiffs] with equivalent educational opportunities as compared to non-disabled individuals who reside in the community" (*id*. at 20, quoting *Summers*, Doc. 57, ¶ 40; *Erie*, Doc. 28, ¶ 48; *Amos*, Doc. 14, ¶ 48; *Campbell*, Doc. 15, ¶ 53), and that LDOH has limited Plaintiffs' "freedom of movement, recreation time, structured activities, and exercise opportunities compared with nondisabled persons who are not committed to ELMHS" (*id*. at 20-21, citing *Summers*, Doc. 56, ¶¶ 41-45; *Erie*, Doc. 28, ¶¶ 50-52; *Amos*, Doc. 14, ¶¶ 50-52; *Campbell*, Doc. 15, ¶¶ 55-57).

Defendants contend that "[n]othing in the *Olmstead* decision, or any part of the ADA/RA/ACA, requires the state to provide all benefits and freedoms available to non-committed persons to persons who are duly committed." (*Id*. at 21.)

In addition, Plaintiffs fail to allege that these kinds of " 'programs' are offered by LDH to non-disabled, non-committed persons." (*Id*.) "The ADA requires 'reasonable modifications' to existing programs but does not require LDH to create new programs so that duly committed persons receive all of the privileges and freedoms available to persons who are not committed." (*Id*., citations omitted.) Thus, Plaintiffs fail to state a claim upon which relief can be granted. (*Id*.)

### B. Plaintiff's Opposition (Doc. 64)

In opposition, Plaintiffs claims that (1) they have standing, (2) *Younger* abstention does not apply, and (3) their complaints state a claim for which relief can be granted.

### 1. Plaintiffs Have Standing

Plaintiffs make five arguments in support of their position that they have standing. First, Plaintiffs contend that LDH "is completely lacking a comprehensive system of community-based care" and "LDH has chosen to warehouse individuals with disabilities at ELMHS instead of providing Community Based Integration, in violation of the integration requirement of the ADA." (Doc. 64 at 9.) As a part of this first argument, Plaintiffs stress that they must only be *at risk* for institutionalization in order to have standing (*id*. at 9-10), and that LDH cannot avoid liability under the ADA and *Olmstead* by failing to have a functional system of CBI (*id*. at 10-12).

Second, Plaintiffs maintain they have standing based on Defendants' refusal to engage in good faith interactive dialogue. (*Id*. at 12-14.) Third, Plaintiffs have standing to challenge Defendants' violation of the program access requirement. (*Id*. at 14-15.) Fourth, Plaintiffs insist that they have standing because they have suffered an injury in fact (*id*. at 15-16), and fifth, that a

favorable decision from the Court will provide Plaintiffs with realistic options for community-based treatment (*id*. at 16-17).

As a part of their initial argument, Plaintiffs address Defendants' contention that Plaintiffs lack standing because they have not alleged that a treatment professional is currently recommending community-based treatment for them. (Doc. 64 at 11.) Plaintiffs note that, while *Olmstead* suggested "the State's treatment professionals" are required to recommend community placement at the time an integration mandate suit is filed, "courts and the DOJ recognize that any treatment professional, whether employed by the state or not, may be used to show that community placement is appropriate." (*Id*., citing *Fisher v. Okla. Health Care Auth*., 335 F.3d 1175, 1181 (10th Cir. 2003) and DOJ's Questions and Answers on the ADA's Integration Mandate and *Olmstead* Enforcement, Question 4.) In any event, Plaintiffs contend that this is a merits-based challenge to their suitability for community-based placement, not a challenge to their standing to seek relief and should wait until after the completion of discovery and exchange of expert reports. (*Id*.)

Defendants overlook the fact that "failure to provide an 'integrated setting' is, in and of itself, a violation of the ADA," which sufficiently confers standing. (*Id*. at 6.) Thus, Plaintiffs reason that they have adequately alleged an injury based on the LDOH's decision to warehouse disabled individuals at ELMHS instead of providing CBI, in direct violation of the integration requirement of the ADA. (*Id*.)

Plaintiffs emphasize that the ADA is "a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.' " (*Id*. at 8, quoting *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (en banc) (citations omitted).) The

ADA "impose[s] upon public entities *an affirmative obligation* to make reasonable accommodations for disabled individuals. Where a defendant fails to meet this affirmative obligation, the cause of that failure is irrelevant." (*Id*., quoting *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454–55 (5th Cir. 2005).)

Moreover, due to its broad nature, it is well settled that an individual must only be at risk for institutionalization to have standing to bring an *Olmstead* challenge. (*Id*. at 9.) Plaintiffs then cite a series of cases in support of this proposition. (*Id*., citing *Pashby v. Delia*, 2013 WL 791829, at *9 (4th Cir. 2013); *M.R. v. Dreyfus*, 663 F.3d 1100, 1116-17 (9th Cir. 2011); *Fisher v. Oklahoma Health Care Authority*, 335 F.3d 1175, 1182 (10th Cir. 2003); *see also Ligas v. Maram*, 2006 WL 644474, at *5 (N.D. Ill. 2006).)

Next, Plaintiffs allege they were "denied access to educational opportunities, recreation, structured activities, and exercise due to LDH's failure to provide Community Based Integration." (*Id.* at 10, citing *Summers*, Doc. 56, ¶¶ 40-44; *Erie*, Doc. 28, ¶¶ 48-52; *Amos*, Doc. 14 at ¶¶ 48-52; *Campbell*, Doc. 15, ¶¶ 53-57.) These allegations are sufficient to allege a violation of the ADA and confer standing on Plaintiffs to bring this action. (*Id*.)

Further, Defendants cannot avoid liability under the ADA and *Olmstead* by failing to have a functional system of CBI. (*Id.* at 10.) Although Plaintiffs have not yet been recommended for community placement, Plaintiffs have alleged that it is likely a treating professional will do so in the future, especially since mental illness is a variable disease. (*Id*. at 10-11.) Plaintiffs aver:

> … it is plausible that the State's treatment professionals will not recommend placement in community-based treatment because LDH does not presently have a meaningful system of Community Based Integration in the first place. . . . That is why Plaintiffs have filed this action: to compel LDH to develop and adequately fund a comprehensive Community Based Integration for individuals with disabilities. Accepting Defendants' arguments would allow a state to avoid the obligations of the integration mandate and *Olmstead* by simply not having a system

19

of community-based treatment. A patient will never be recommended for community-based treatment if that option is not meaningfully available.

(*Id*. at 11-12.)

In their second argument for standing, Plaintiffs maintain they have standing based on (1) Defendants' denial of their request for reasonable accommodations and (2) Defendants' failure to engage in an interactive dialogue with Plaintiffs or their counsel. (*Id*. at 12-14, citing at 13, n.35, *Summers*, Doc. 56, ¶ 92; *Erie*, Doc. 28, ¶ 90; *Amos*, Doc. 14, ¶ 90; *Campbell*, Doc. 15, ¶¶ 103, 108, 113.) Defendants have not responded to these requests, nor has the LDOH taken any steps requested by Plaintiffs to establish a system of CBI. (*Id*. at 13-14.)  Defendants have also failed to engage in an interactive dialogue with Plaintiffs or their counsel regarding the requested accommodations. (*Id*.)

Next, Plaintiffs argue that they have standing to challenge Defendants' violation of the "program access" requirement of the ADA and RA. (*Id*. at 14-15.) The "program access" requirement mandates that "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." (*Id*. at 14, quoting 28 C.F.R. § 35.150(a)(1).)

Here, Plaintiffs allege that ELMHS is not readily accessible or usable by Plaintiffs. For example, Plaintiffs have significantly limited freedom of movement and are not provided with the same opportunities for recreation as they would be if they were provided Community Based Integration. (*Id*. at 14.)  If Plaintiffs were provided CBI, they could utilize structured activities provided through the community that are not available at ELMHS. (*Id*.)  Plaintiffs emphasize that they "are not demanding that LDH provide these services[;] instead, they assert that they would have access to more opportunities for education and recreation if the LDH complied with the integration mandate." (*Id*. at 14-15.)

Plaintiffs' final two arguments address injury in fact and redressability. As to injury in fact,

Plaintiffs urge that they:

> were denied access to programs, services, and activities due to Defendants' failure
> to comply with ADA/RA/ACA. Specifically, Plaintiffs allege they have been
> denied 1) equivalent educational opportunities that are available to individuals who
> reside in the community; 2) the opportunity for private recreation with greater
> frequency and regularity; 3) access to structured activities that are available in the
> community; and 4) the opportunity to exercise with greater frequency and
> regularity. Plaintiffs allege they have been denied access to community services
> and programs because they have been improperly warehoused at ELMHS, which is
> itself a violation of the ADA.

(*Id*. at 15-16, record citations to Plaintiffs' complaints omitted.)

As to redressability, Plaintiffs argue that "a favorable ruling from the Court will redress

their injuries and provide realistic opportunities for community-based treatment … [because]

Plaintiffs are far less likely to receive a recommendation for community-based treatment when no

realistic options for that placement exists [sic] in the current LDH system." (*Id*. at 16.)

## 2. *Younger* Abstention Does Not Apply

As to *Younger* abstention, Plaintiffs argue that Defendants mischaracterize the injunctive

relief they are requesting.  Contrary to Defendants representations, "Plaintiffs do not pray for, and

are not seeking through this action, release from ELMHS in contravention to any State order."

(Doc. 64 at 18; *see also id*. at 20.) Instead, Plaintiffs are seeking to force the LDOH to develop a

comprehensive system of community-based treatment in line with its obligations under the ADA.

(*Id*.) This relief will: (1) provide judges with more options for placement and treatment of forensic

patients with mental disabilities; (2) not replace judicial discretion or limit judges' ability to

conduct evidentiary hearings; and (3) improve Plaintiffs' likelihood of receiving community-based

placement. (*Id*. at 18-20.) Thus, an injunction in favor of Plaintiffs will not interfere with their state

court criminal proceedings.

Defendants do not cite a single case brought pursuant to *Olmstead* where a court abstained under *Younger* when addressing claims of discrimination under the ADA, RA, or ACA. (*Id.* at 19.) "Instead, federal courts regularly exercise jurisdiction over questions involving due process and institutionalization of disabled individuals." (*Id.*, quoting *Harrison v. Phillips*, 395 F. Supp. 3d 800, 810 (N.D. Tex. 2019) (*citing Knowles v. Horn*, 2010 WL 517591 (N.D. Tex. Feb. 10, 2010); *Olmstead*, 527 U.S. 581).) Plaintiffs also point the Court to *Durnell v. Holcomb*, 467 F. Supp. 3d 644, 651 (S.D. Ind. 2020), in which they argue the court denied *Younger* abstention in a case similar to the present one. (*Id.* at 19-20.)

Further, Plaintiffs argue *Younger* is inapplicable because they would be unable to obtain the relief they seek in this case through the state criminal proceedings.

> The notion that Plaintiffs can obtain an injunction forcing Defendants to develop a system of Community Based Integration in line with the provisions of the DOJ and *Olmstead* through their respective criminal proceedings is belied by common sense and thirty years of history. Defendants cite no Louisiana statute that would authorize a state court judge handling a NGRI case to enjoin LDH to comply with the mandates of the ADA/RA/ACA. In their criminal proceedings, Plaintiffs are limited to the placement options that are already available in the current system. Any assessment of a patient for placement will be based on the completely insufficient community resources that are currently available.

(*Id.* at 21.)

### 3. Plaintiffs Have Stated a Claim

Plaintiffs argue that they have stated a claim under the ADA by virtue of Defendants' failure to make reasonable accommodations after having been sent "detailed requests for accommodations" by Plaintiffs' counsel. (Doc. 64 at 23, citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).) As to those Plaintiffs whose requests were ignored altogether (Summers, Erie, and Stelly) as well as those Plaintiffs where Defendants responded but refused

accommodations/modifications (Amos, Robinson, Campbell, and McInnis), the failure to provide accommodations gives rise to a cause of action under the ADA. (*Id*. at 23-24.)

Plaintiffs insist that Defendants' contention that their accommodation requests were not reasonable is a merits-based argument and that, at the pleading stage, Plaintiffs have "allege[d] sufficient facts to show that a reasonable accommodation or modification was plausibly requested." (*Id*. at 25.) Furthermore, "the reasonableness of a request is a fact intensive inquiry that is not suitable for … a motion to dismiss." (*Id*.) Plaintiffs maintain that their requests, contrary to Defendants' argument, were specific and Plaintiffs are "not required to outline in their complaints the granular steps that Defendants must take to achieve said modification." (*Id*. at 26, citation omitted.)

As to Plaintiffs' intentional discrimination claims, Plaintiffs argue they have sufficiently pled that Defendants intentionally violated the ADA when, after being advised of Plaintiffs' requests for accommodation and the need therefor, Defendants refused to accommodate Plaintiffs. (*Id*. at 27-28, citing *Cadena v. El Paso Cty*., 946 F.3d 717, 724 (5th Cir. 2020) and *Mealey v. Gautreaux*, Civ. No. 16-716, slip op. at 22 (M.D. La. Jan 31, 2020) (deGravelles, J.).) Further, Defendants have acknowledged that "the lack of community placement options in the LDH system causes patients at ELMHS to stay beyond maximum benefit [and] courts are hesitant to release patients at ELMHS before they are observed in a community treatment setting." (*Id*. at 28, citing *Summers*, Doc. 56, ¶¶ 53, 54, 61; *Erie*, Doc. 28, ¶¶ 61, 69, 70; *Amos*, Doc. 14, ¶¶ 61, 62, 69; and *Campbell*, Doc. 15 at ¶¶ 66, 67, 74.) This knowledge, combined with Defendants' failure to act, constitutes intentional discrimination.

Finally, Plaintiffs contend Defendants violated the ADA/RA by failing to comply with the ADA/RA program access requirements. (Doc. 64 at 29-30.) Because Plaintiffs are "warehoused at

ELMHS" by Defendants, argue Plaintiffs, they have "significantly limited freedom of movement" and are thus deprived of the opportunities for recreation, education, and exercise they would get if they were allowed involvement in CBI. (*Id*.) Again, "Plaintiffs are not demanding that LDH provide these services [but] assert that they would have access to more opportunities for education and recreation if the LDH complied with the integration mandate." (*Id*. at 30.)

## IV.    DISCUSSION

Defendants raise three arguments in support of their *Motion*: (1) Plaintiffs lack standing to bring their claims; (2) the *Younger* abstention doctrine applies and precludes the Court from granting the injunctive relief requested by Plaintiffs; and (3) Plaintiffs fail to state a claim upon which relief can be granted. (Doc. 57 at 2.) Because the Court finds that Plaintiffs' claims fail for lack of standing, it addresses only this issue.

### A.  Standing

Defendants argue that Plaintiffs lack standing because: (1) they have not suffered an invasion of a concrete and particularized legally protected interest, which invasion is actual or imminent rather than conjectural or hypothetical; (2) none of Plaintiffs are alleged to have current recommendations for participation in community based programs, and their allegations that "they will likely obtain a recommendation for community-based treatment in the future" are conclusory, abstract, hypothetical, speculative, and unsupported by facts; (3) for purposes of their claim for monetary damages, Plaintiffs "have not sustained a past injury-in-fact that is fairly traceable to the conduct of Defendants," a requirement for standing; and, (4) Plaintiffs have failed to show that it is likely, as opposed to merely speculative, that the alleged injury will be redressed by a favorable decision. (Doc. 57-1 at 8-15.) Each of these arguments will be addressed.

### 1. General Law on Standing

Standing is a matter of jurisdiction.

'[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'

Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood. The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–38 (2016), *as revised* (May 24, 2016) (cleaned up).

Whether Plaintiffs have standing "is to be assessed under the facts existing when the complaint is filed." *Daves v. Dallas Cnty., Texas*, 984 F.3d 381, 392 (5th Cir. 2020), *reh'g en banc granted*, *order vacated*, 988 F.3d 834 (5th Cir. 2021), and *on reh'g en banc*, 22 F.4th 522 (5th Cir. 2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992)).

"To have Article III standing, a plaintiff must show an injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed by the plaintiff's requested relief." *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (citing *Lujan*, 504 U.S. at 560-61). "Courts have divided this rule into three components: injury in fact, causation, and redressability." *Id*. (citing *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (referencing "the now-familiar elements of injury in fact, causation, and redressability")).

The party invoking federal jurisdiction bears the burden of establishing these elements.  Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.

*Lujan*, 504 U.S. at 561 (citation omitted).

In this case, Plaintiffs have alleged entitlement to past damages as well as for declaratory and injunctive relief. "[A] plaintiff must demonstrate standing separately for each form of relief

sought." *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 396 (5th Cir. 2015) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)).

> Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements. The redressability requirement limits the relief that a plaintiff may seek to that which is likely to remedy the plaintiff's alleged injuries. Because injunctive and declaratory relief cannot conceivably remedy any past wrong, plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury. That continuing or threatened future injury, like all injuries supporting Article III standing, must be an injury in fact. To be an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) concrete and particularized, not abstract; and (3) actual or imminent, not conjectural or hypothetical. The purpose of the requirement that the injury be imminent is to ensure that the alleged injury is not too speculative for Article III purposes. For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur.

*Stringer v. Whitley*, 942 F.3d 715, 720–21 (5th Cir 2019) (internal quotation marks and citations omitted).

With respect to statutory violations, "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.' " *Spokeo, Inc.*, 578 U.S. 330, 341 (quoting *Lujan*, 504 U.S. at 578, 112 S. Ct. 2130); *see also Lujan*, 504 U.S. at 578, 112 S. Ct. 2130 (noting as an example "injury to an individual's personal interest in living in a racially integrated community").

Where plaintiffs allege a statutory violation, a concrete injury must still be established. *Spokeo, Inc.*, 578 U.S. at 341. However, the Supreme Court has explained that "[a]lthough tangible injuries are perhaps easier to recognize, ... intangible injuries can nevertheless be concrete." *Id.* at 340. A procedural violation may also meet the injury-in-fact requirement " 'so long as the procedures in question are designed to protect some threatened concrete interest of [the petitioner] that is the ultimate basis of his standing.' " *Iowa League of Cities*, 711 F.3d at 870–71 (quoting *Lujan*, 504 U.S. at 573 n.8).

"[P]laintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury." *Stringer*, 942 F.3d at 720. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). Likewise, a plaintiff's speculation that a future injury may occur is not sufficient to warrant injunctive relief. *Id.* at 497. A plaintiff must show that the threat of injury is "real and immediate." *Id.* at 496.

The Supreme Court has explained that "[w]hen the suit is one challenging the legality of government action or inaction" and "the plaintiff is himself an object of the action (or forgone action) at issue ..., there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62; *see also Iowa League of Cities*, 711 F.3d at 871. However, establishing redressability requires the plaintiff to show that it is "more than merely speculative that the relief requested would have any effect to redress the harm to the plaintiff." *Young Am. Corp.*, 424 F.3d at 845 (quoting *Hall v. LHACO, Inc.*, 140 F.3d 1190, 1196 (8th Cir. 1998)).

## 2. Standing under the ADA and *Olmstead*

" 'The actual or threatened injury required ... may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing[,]' [and thus] an allegation that defendants have violated the ADA and the Rehabilitation Act may suffice as an allegation of injury-in-fact." *Innovative Health Sys., Inc. v. City of White Plains*, 931 F. Supp. 222, 237 (S.D.N.Y. 1996) (quoting *Warth*, 422 U.S. at 500) (quotations omitted), *aff'd in part*, 117 F.3d 37 (2d Cir. 1997); *see also Disability Rts. New York v. New York State*, No. 17-6965, 2019 WL 2497907, at *12 (E.D.N.Y. June 14, 2019). "Through the ADA and the [Rehabilitation Act], Congress has elevated

27

the segregation of individuals with disabilities 'to the status of a legally cognizable injury.' "

*Murphy ex rel. Murphy v. Minn. Dep't of Human Servs.,* 260 F. Supp. 3d 1084, 1101 (D. Minn.

2017) (quoting *Spokeo*, 578 U.S. 330, 341) (alterations omitted). Although "Congress'[s] role in

identifying and elevating ... harms does not mean that a plaintiff automatically satisfies the injury-

in-fact requirement whenever a statute grants a person a statutory right," *Spokeo*, 578 U.S. at 341,

the segregation of people with disabilities is an injury-in-fact for the purposes of standing only if

it is concrete and particular to Plaintiffs.

> [W]hether compliance with [an Act of Congress] would prevent future injury to
> others is irrelevant; plaintiffs seeking injunctive relief must show a continuing or
> threatened future injury *to themselves*. Standing also does not follow from the
> conclusion that the injunctive relief sought by a plaintiff would prevent the plaintiff
> from suffering the same injury in the future, which is always true when a plaintiff
> seeks an injunction prohibiting a defendant from repeating an action that injured
> the plaintiff in the past. Plaintiffs must also show that there is a *substantial risk* that
> they will suffer the potential future injury absent their requested relief.

*Stringer* at 721 (citations omitted) (reversing and remanding because the district court failed to

address the probability of Plaintiffs being injured in the future absent their requested relief)

(emphasis added).

> A threatened injury qualifies as an injury-in-fact if three requirements are met: (1)
> the injury is "potentially suffered by plaintiff, not someone else"; (2) it is "concrete
> and particularized, not abstract"; and (3) the injury is "actual or imminent, not
> conjectural or hypothetical." [*Stringer*] at 720–21. A threatened injury must be
> imminent "to ensure that the alleged injury is not too speculative for Article III
> purposes." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 185
> L. Ed. 2d 264 (2013). The imminence requirement for a threatened injury is
> satisfied only if there is "at least a 'substantial risk' that injury will occur." *Id*.
> (quoting Susan B. Anthony List, 573 U.S. at 158, 134 S. Ct. 2334).

*Texas Voters All. v. Dallas Cnty*., 495 F. Supp. 3d 441, 451 (E.D. Tex. 2020).

Specifically, Title II of the ADA provides that "no qualified individual with a disability

shall, by reason of such disability, be excluded from participation in or be denied the benefits of

the services, programs, or activities of a public entity, or be subjected to discrimination by any

such entity." 42 U.S.C. § 12132. Similarly, § 504 of the RA provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

The Attorney General adopted regulations to implement those statutory provisions. According to the Attorney General's integration regulation, "[a] public entity shall administer services, programs, and activities in the *most integrated setting* appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (emphasis added); *see Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 591-92 (1999). The reasonable-modifications regulation requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

Title II prohibits discrimination by "public entities," 42 U.S.C. § 12131(1), and state punitive institutions fall squarely within this statutory definition. *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998). This inclusion means that state operated prisons and jails must modify their policies, practices, and procedures to avoid discrimination and ensure equal access for individuals with disabilities while they are incarcerated. 42 U.S.C. § 12131(1). In *Yeskey*, the Supreme Court held that "the ADA plainly covers state institutions *without* any exception that could cast the coverage of prisons into doubt." 524 U.S. at 209 (1998) (emphasis in original).

Nowhere does the ADA, RA, or ACA exclude NGRI acquittees from coverage and indeed, it is clear that those in prison who have been convicted of a crime are entitled the benefits of the

ADA. *Lewis v. Cain*, 2021 WL 1219988, at *43 (M.D. La. Mar. 31, 2021); *Yeskey*, 524 U.S. at 213 ("Title II of the ADA unambiguously extends to state prison inmates."); *George v. Louisiana Dep't of Pub. Safety & Corr.*, 2016 WL 3568109, at *8–9 (M.D. La. June 23, 2016) ("Under well-established precedent, prisoners may bring claims against their jailors for disability discrimination under Title II of the ADA and Section 504 of the RA." (citing *Yeskey*, 524 U.S. at 209-10)); *see also, e.g., Frame v. City of Arlington*, 657 F.3d 215, 224-25 (5th Cir. 2011); *George v. Louisiana Dep't of Pub. Safety & Corr.*, 272 F. Supp. 3d 855, 885 (M.D. La. 2017).

But the question here is whether these Plaintiffs have standing to sue under these three statutes. In *Olmstead v. L.C. ex rel. Zimring*, the Supreme Court held that under Title II of the ADA, "States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated." 527 U.S. at 607. A failure to integrate such individuals into the community is "unjustified isolation" that constitutes disability discrimination. *Id.* at 597. Two harms flow from this discrimination: (1) the perpetuation of "unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life"; and (2) the restriction of "the everyday life activities of individuals, including family relations, social contracts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600-01.

### 3. NGRI Status, Civil Commitment Status, Pretrial Detainee Status, and Standing

In an *Olmstead* case, it is possible that "an allegation that defendants have violated the ADA and the Rehabilitation Act may suffice as an allegation of injury-in-fact." *Innovative Health Sys., Inc. v. City of White Plains*, 931 F. Supp. 222, 237 (S.D.N.Y. 1996), *aff'd in part*, 117 F.3d 37 (2d Cir. 1997). However, this is not a typical *Olmstead* case. Of the eight Plaintiffs, six have

been adjudicated NGRI, one is committed by virtue of having been found irrestorably incompetent, and one is a pretrial detainee.[6] Plaintiffs in this case are therefore fundamentally different from those in *Olmstead*, where plaintiffs were mentally ill persons voluntarily admitted to a hospital for psychiatric treatment. *Olmstead*, 527 U.S. at 593.

The Court in *Olmstead* found that "unjustified institutional isolation of persons with disabilities is a form of discrimination" under the ADA. *Id.* at 600. When one examines the state law commitment procedures for those found NGRI, irrestorably incompetent, or held without bail in pretrial detention, as the Court does below, it is apparent that Plaintiffs' institutionalizations and segregation from the community are not "unjustified," undue, or unnecessary. Indeed, Plaintiffs do not contend that their segregation from the community pursuant to these state procedures violated the Constitution or the ADA, RA, or ACA.

As Defendants note, six of the Plaintiffs were committed to ELMHS based on La. Code Crim. Proc. art. 654, which provides:

> When a verdict of not guilty by reason of insanity is returned in a capital case, the court shall commit the defendant to a proper state mental institution or to a private mental institution approved by the court for custody, care, and treatment.
>
> When a defendant is found not guilty by reason of insanity in any other felony case, the court shall remand him to the parish jail or to a private mental institution approved by the court and shall promptly hold a contradictory hearing at which the defendant shall have the burden of proof, to determine whether the defendant can be discharged or can be released on probation, without danger to others or to himself. If the court determines that the defendant cannot be released without danger to others or to himself, it shall order him committed to a proper state mental institution or to a private mental institution approved by the court for custody, care, and treatment. If the court determines that the defendant can be discharged or released on probation without danger to others or to himself, the court shall either

---

[6] With the exception of Plaintiffs Robinson and McKinnis, all Plaintiffs have mental illness and are committed to ELMHS pursuant to Louisiana Code of Criminal Procedure Article 657 by virtue of having been adjudicated NGRI. (*Summers*, Doc. 56, ¶¶ 74-83; *Erie*, Doc. 28, ¶ 15; *Amos*, Doc. 14, ¶ 15; *Campbell*, Doc. 15, ¶ 20.) Robinson alleges he was found to be irrestorably incompetent to stand trial pursuant to *Lockhart v. Armistead*, 351 So. 2d 486 (1977). (*Amos*, Doc. 14, ¶ 15.)  McInnis alleges he has not been adjudged NGRI and is a pre-trial detainee. (*Campbell*, Doc. 15, ¶ 20.)

order his discharge, or order his release on probation subject to specified conditions for a fixed or an indeterminate period. The court shall assign written findings of fact and conclusions of law; however, the assignment of reasons shall not delay the implementation of judgment.

La. Code Crim. Proc. art. 654.

This Court has previously explained the rights of NGRI acquittees as it pertains to this code article in *George v. Louisiana Dep't of Pub. Safety & Corr.*, 272 F. Supp. 3d 855, 885 (M.D. La. 2017) (deGravelles, J.):

> In delineating the boundaries of the Fourteenth Amendment's due process protections for NGRI acquittees, courts have often looked to the protections given to individuals who have been civilly committed or to pretrial detainees. *See e.g., Poree*, 866 F.3d at 244–245 & n.31. (also observing that Louisiana's statutory scheme "likens conditional release [of an NGRI acquittee] to probation."). And there is reason for this favorable comparison since an NGRI acquittee, like a pretrial detainee or one civilly committed, has not been found legally responsible for the commission of a crime.
>
> But there are important differences too. As stated by the District Court's decision in *Poree*:
>
>> The Supreme Court has also recognized that different considerations underlie the commitment of insanity acquittees, holding that "insanity acquittees constitute a special class that should be treated differently from other candidates for commitment." *Jones*, 463 U.S. [at] 370 [103 S. Ct. 3043]. For example, "the fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness." *Id*. at 364 [103 S. Ct. 3043] (citing *Lynch v. Overholser*, 369 U.S. 705, 714 [82 S. Ct. 1063, 8 L. Ed. 2d 211] (1962) (that the accused was found to have committed a criminal act is "strong evidence that his continued liberty could imperil 'the preservation of the peace' "). The Court has also indicated that concrete evidence that an individual committed a crime is "at least as persuasive as any predictions about dangerousness that might be made in a civil-commitment proceeding." *Jones*, 463 U.S. at 364–65 [103 S. Ct. 3043].

*George*, 272 F. Supp. 3d at 885 (quoting *Poree v. Kollins*, No. 12-1068, 2014 WL 346081, at *8 (E.D. La. Jan. 29, 2014)).

The U.S. Fifth Circuit has also indicated that, although insanity acquittees are entitled to substantially the same procedural protections afforded those civilly committed, insanity acquittees can be viewed differently when being considered for release since the "prior anti-social conduct of an insanity acquittee justifies treating such a person differently[.]" *Powell v. Florida*, 579 F.2d 324, 333 (5th Cir. 1978). *See also Warren v. Harvey*, 632 F.2d 925, 931 (2nd Cir. 1980) (that insanity acquittees have been found, beyond a reasonable doubt, to have committed a criminal act indicates they have "proved themselves a danger to society at one time"); *Poree v. Kollins*, 2014 WL 346081, at *8 (E.D. La. Jan. 29, 2014), *aff'd*, 866 F.3d 235 (5th Cir. 2017); *Jones v. United States*, 463 U.S. 354, 366 (1983) ("a finding of not guilty by reason of insanity is a sufficient foundation for commitment of an insanity acquittee for the purposes of treatment and the protection of society."). In light of the above, it is clear that Louisiana has a penological and societal interest in keeping society safe from NGRI acquittees and, as long as the danger continues, keeping them separated from the community.

Robinson alleges he was found "irrestorably incompetent to stand trial pursuant to *Lockhart v. Armstead*, 351 So.2d 496 (1977)." (*Amos*, Doc. 14, ¶ 15.)[7] No further explanation is given by Plaintiffs in their operative complaint or in briefing. Defendants state: "Robinson alleges he has been determined by a court to be incompetent to stand trial pursuant to La. [Code Crim. Proc.] art. 647 and is subject to the procedure set out in La. [Code Crim. Proc.] art. 648. In light of La. [Code Crim. Proc. art] 648(B), it is likely that Mr. Robinson is actually committed to ELMHS on a civil judicial commitment pursuant to La. R.S. 28:54." (Doc. 57-1 at 4.) The Court agrees.

In Louisiana, a defendant may be adjudged mentally incapacitated and unable to stand trial "when, as a result of mental disease or defect, a defendant presently lacks the capacity to

understand the proceedings against him or to assist in his defense." La. Code Crim. Proc. art. 641. The issue of the defendant's mental incapacity may be raised at any time by the defense, the prosecution, or the court, and the criminal prosecution comes to a halt once the issue is raised. *Id.* art. 642. If the court "has reasonable ground to doubt the defendant's mental capacity to proceed," it is required to order an examination into the defendant's mental health. *Id.* arts. 643, 647. To assist in this inquiry, the court appoints a sanity commission that consists of two or three qualified physicians or, in lieu of one physician, a qualified clinical or medical psychologist with experience or training in forensic evaluations. *Id.* art. 644.This commission examines the defendant and issues a report on his mental state.[8] *Id.* art. 645. The court then holds a contradictory hearing in which the sanity commission's report is admissible evidence and the members of the commission may be called as witnesses and cross-examined by the defense, the prosecution, or the court. *Id.* art. 647.

If the court determines that the defendant lacks the mental capacity to proceed, the proceedings are suspended, and Louisiana Code of Criminal Procedure Article 648 governs. Article 648(A) involves an incapacity to proceed which may be potentially remedied in the foreseeable future. Article 648(B) applies to commitments which occur if an incapacity to proceed cannot be remedied within the foreseeable future. Plaintiff Robinson falls within (B) because he was found, according to Plaintiffs, permanently incompetent to stand trial or "irrestorably incompetent".

Article 648(A) authorizes judicial commitment of certain individuals who lack capacity until such time as capacity to proceed is restored. At any time during this commitment, and on the

---

[8] The sanity commission is to make findings regarding the defendant's capacity to understand the proceedings against him, his ability to assist in his defense, and his need for inpatient hospitalization if found incompetent. La. Code Crim. Proc. art. 645(A). The defendant or the prosecution may also arrange for an independent mental examination if they so choose. *Id.* art. 646.

recommendation of the treatment facility that "the defendant will not attain the capacity to proceed with his trial in the foreseeable future," the court must hold a "contradictory hearing to determine whether the defendant is, and will in the foreseeable future be, incapable of standing trial and whether he is a danger to himself or others." La. Code Crim. Proc. art. 648(B)(1). If the court determines the defendant is not likely to regain competency in the foreseeable future, the defendant must be "released or remanded to the custody of the Louisiana Department of Health," which may (a) institute civil commitment proceedings or (b) release the defendant.[9] *Id.* art. 648(B)(3).

Civil commitment procedures are established in Title 28 of the Louisiana Revised Statutes. Under La. R.S. 28:54(A),

> The department … may file with the court a petition which asserts his belief that a person is suffering from mental illness which contributes or causes that person to be a danger to himself or others or to be gravely disabled, or is suffering from a substance-related or addictive disorder which contributes or causes that person to be a danger to himself or others or to be gravely disabled and may thereby request a hearing.

After the petition is filed, the court must determine whether probable cause exists that "the respondent is suffering from mental illness which contributes to his being or causes him to be a danger to himself or others or gravely disabled, or is suffering from a substance-related or addictive disorder which contributes to his being or causes him to be a danger to himself or others or gravely disabled." La. R.S. 28:54(D)(1).

---

[9] La. Crim Proc. art. 648(B)(3) continues:

> If the defendant is committed to a treatment facility pursuant to Title 28 of the Louisiana Revised Statutes of 1950, the director of the institution designated for the patient's treatment shall, in writing, notify the court and the district attorney when the patient is to be discharged or conditionally discharged, as long as the charges are pending. If not dismissed without prejudice at an earlier trial, charges against an unrestorable incompetent defendant shall be dismissed on the date upon which his sentence would have expired had he been convicted and received the maximum sentence for the crime charged, or on the date five years from the date of his arrest for such charges, whichever is sooner, except for [certain charges.]

If the court determines that probable cause exists, the court shall appoint a physician, to examine the respondent and make a written report to the court and the respondent's attorney.

> This report shall set forth specifically the objective factors leading to the conclusion that the person has a mental illness or suffers from a substance-related or addictive disorder, the actions or statements by the person leading to the conclusion that the mental illness or substance-related addictive disorder causes the person to be dangerous to himself or others or to be gravely disabled and in need of immediate treatment as a result of such illness or disorder, and why involuntary confinement and treatment are indicated.

La. R.S. 28:54(D)(1).

After a hearing, a court must order a person judicially committed if it "finds by clear and convincing evidence that [he] is dangerous to [him]self or others or is gravely disabled, … as a result of … mental illness[.]" La. R.S. 28:55(E)(1).

Judicial commitments shall be reviewed by the court issuing the order at certain intervals. La. R.S. 28:56(A). At these intervals, the director of the treatment facility shall issue reports to the court setting forth the patient's response to treatment, his current condition, and the reasons why continued involuntary treatment is necessary to improve the patient's condition or to prevent it from deteriorating. La. R.S. 28:56(A). The court may at any time order a new hearing to determine whether the involuntary status should be continued.

From this, several things are apparent. First, to be found "irrestorably incompetent" as Robinson alleges he was, a state court must have found by clear and convincing evidence that he "is dangerous to [him]self or others or is gravely disabled, … as a result of … mental illness[.]" La. R.S. 28:55(E)(1). Second, there is a mechanism for such an individual to be released but, like with those found NGRI, that mechanism is controlled by a state court and LDH has no power to either commit such an individual to ELMHS or secure that person's release.

Finally, with respect to McInnis, Plaintiffs tell us that his reason for being held at ELMHS is that "he has not been adjudged NGRI and is a pre-trial detainee." (*Campbell*, Doc. 15, ¶ 20.) He

claims that he has cerebral palsy/spastic palsy and has difficulty walking and standing. (*Id.*, ¶¶ 93-95.) Aside from these brief allegations, we know nothing of the circumstances of or reasons for McInnis' confinement at ELMHS or the particulars surrounding his pretrial detention. As with Robinson, McInnis' allegations in his operative complaint and arguments made in Plaintiffs' opposition to the *Motion* are essentially identical to those of the NGRI Plaintiffs, and Plaintiffs do not argue that the non-NGRI status of Robinson and McInnis requires that they be treated differently from the other Plaintiffs.

Under the Louisiana Constitution Art. 1 § 18 and La. Code Crim. Proc. art. 312, there is a presumption in favor of pretrial release or bail. However, under Louisiana law, a person charged but not convicted of a crime may, under certain circumstances, be held without bail. *See*, *e,g*., La. Code Crim. Proc. arts. 312, 313, 316, 332. Before that person can be held without bail, there must be a contradictory hearing before a state court.

> [I]n accordance with La. Const. Art. 1, § 18 and La. C. Cr. P. arts. 312 and 313(B), relator may be held without bail pending trial only if, after a contradictory hearing, the proof is evident and the presumption of guilt is great and the trial court finds by clear and convincing evidence that there is a substantial risk that relator may flee or poses an imminent danger to any other person or the community.

*State v. Chester*, 18-504 (La. App. 5 Cir. 9/6/18), 2018 WL 4265657, at *2 (unpublished).

> Under "Gwen's Law," La. Code Crim. P. art. 313, the trial court is required to conduct a contradictory hearing to determine the feasibility of granting bail to a person arrested on domestic abuse charges. *State v. Poirier*, 18-467 (La. App. 3 Cir. 7/11/18), 251 So.3d 486. If the trial court finds that there is a likelihood that the defendant would inflict further harm, bail can be denied and the defendant would stay in jail until the case is heard in court. La. Code Crim. P. art. 313(A)(4).

*Bettevy v. Bettevy*, 2019-327 (La. App. 3 Cir. 11/6/19), 283 So. 3d 1047, 1049.

Factors which the court may consider in deciding whether to allow release on bond and the amount of same include "[t]he nature and seriousness of the danger to any other person or the community that would be posed by the defendant's release." La. Code Crim. Proc. art. 316(5). Under Article 313, factors include "[t]he potential threat or danger the defendant poses to the

victim, the family of the victim, or to any member of the public, especially children[,]" *id.* art. 313(A)(3)(b), and whether "the defendant poses an imminent danger to any other person or the community," *id.* art. 313(B).

Like NGRI acquittees and those civilly committed, LDH plays no role in whether an individual is held in pretrial detention. As with the other Plaintiffs, the state court controls whether he should be placed on pretrial detention or whether and under what conditions he should be released. As with the other Plaintiffs, safety to the community is a factor in whether the individual should be detained.

### 4. Plaintiffs' Standing in This Case

The Court now turns to whether Plaintiffs have alleged "an injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed by the plaintiff's requested relief." *Stringer v. Whitley*, 942 F.3d at 720 (5th Cir. 2019) (citing *Lujan*, 504 U.S. at 560-61). For purposes of both Plaintiffs' demand for past damages and their demand for declaratory and injunctive relief, have Plaintiffs shown that their alleged injury in fact is redressable by the relief sought, a part of the "irreducible constitutional minimum of standing?" *Lujan*, 504 U.S. at 560.

Specifically, for purposes of Plaintiffs' demand for declaratory and inductive relief, the question is whether Plaintiffs sufficiently alleged a "continuing injury or threatened future injury … [that is] (1) potentially suffered by the plaintiff, not someone else; (2) concrete and particularized, not abstract; and (3) actual or imminent, not conjectural or hypothetical." *Stringer* at 720–21 (internal quotation marks and citations omitted). Regarding the imminence requirement, have Plaintiffs sufficiently alleged that there is "at least a substantial risk that the injury will occur?" *Id.* at 721 (cleaned up).

The Court finds that Plaintiffs have failed to meet their burden to establish standing for either their past damages claim or their claim for injunctive relief. The Court begins by identifying the injury in fact claimed by Plaintiffs. In certain paragraphs of the four complaints, Plaintiffs suggest that LDOH violated the ADA, RA, and ACA by "warehous[ing] individuals with disabilities at the ELMHS instead of providing Community Based Integration." (*Summers*, Doc. 56 ¶ 39; *Erie*, Doc. 28, ¶ 47; *Amos*, Doc. 14, ¶ 47; *Campbell*, Doc. 15, ¶ 52). "Plaintiffs lack access to opportunities for recreation and education because they are warehoused at ELMHS." (Doc. 64 at 29.) "Patients at ELMHS have significantly limited freedom of movement and are not provided with the same opportunities for recreation as they would [be] if they were provided Community Based Integration." (*Id*., citing *Summers*, Doc. 56, ¶ 42; *Erie*, Doc. 28, ¶ 50; *Amos*, Doc. 14, ¶ 50; *Campbell*, Doc. 15, ¶ 55.) The foundation for Plaintiffs' claim is that such "undue" or "unjust" segregation violates the ADA's integration mandate.

But Defendants have not "warehoused" Plaintiffs at ELMHS because Defendants played no role in their commitment to ELMHS and have no ability to release them. The institutionalization of the six NGRI Plaintiffs is by virtue of a Louisiana state court finding that they "cannot be released without danger to others or to [themselves]…"[10] La. Code Crim. Proc. art 654. Plaintiffs do not challenge their status as NGRI acquittees.

Robinson's commitment was based on a state court finding and order that he "is dangerous to [him]self or others or is gravely disabled, … as a result of … mental illness[.]" La. R.S. 28:55(E)(1). For McInnis, we know that he has been separated from the community by a state court and can only be released by a state court under circumstances that require the court to consider the safety of the community. La. Code Crim. Proc. arts. 312, 313, 316. Therefore, it is

---

[10] *Summers* alleges without explanation that he "is currently being held without a legal basis." (Doc. 56, ¶ 8.) However, there is no factual or legal support given for this statement, nor does he ask to be released from ELMHS.

clear that Defendants are not responsible for Plaintiffs' institutionalization, nor do they have the power to release Plaintiffs into the community. If institutionalization were the alleged injury in fact, that harm clearly cannot be "fairly traceable to the challenged action of the defendant" since Plaintiffs' institutionalization at ELMHS and the resulting segregation from the community is not the result of anything Defendants did or did not do.

Plaintiffs insist, however, they are "not challenging their institutionalization, but rather, are seeking to force LDH to comply with their obligations under the ADA to develop a system of community-based treatment." (Doc. 64 at 3.) Furthermore, they are not asking for Defendants to release Plaintiffs into the community. (*Id.* at 2-3.) As stated in their complaints: "[Plaintiffs] do[ ] not ask for release or seek the entitlement to such relief. Instead [Plaintiffs] seek[ ] for Defendants to be Ordered to comply with the ADA/RA/ACA, which would merely enhance [Plaintiffs'] eligibility for accelerated release from ELMHS." (*Summers*, Doc. 56, ¶ 100; *Erie*, Doc. 28, ¶ 96; *Amos*, Doc. 14, ¶ 95; *Campbell*, Doc. 15, ¶ 118.)

Therefore, the injury in fact identified by Plaintiffs is the alleged failure of Defendants to develop and implement a program of community-based treatment that would be available to those institutionalized at ELMHS who would be eligible for such treatment. The main question before the Court is whether that harm is "likely to be redressed by the plaintiff's requested relief." *Stringer v. Whitley*, 942 F.3d at 720 (citing *Lujan*, 504 U.S. at 560-61). Asked another way, is the "continuing injury or threatened future injury" from Defendants' failure to have a system of community-based treatment one that is "(1) potentially suffered by the plaintiff, not someone else; (2) concrete and particularized, not abstract; and (3) actual or imminent, not conjectural or hypothetical[?]" *Id.* at 720–21 (internal quotation marks and citations omitted). As regards the imminence requirement, have Plaintiffs sufficiently alleged that there is "at least a 'substantial

risk' that the injury [resulting from the absence of a community-based treatment program] will occur[?]" *Id*. at 721.

Here, the Court finds that Plaintiffs have failed to meet their burden. It is true that those who are adjudicated NGRI may qualify for release into the community if there is a recommendation from the hospital-based review panel and the state court orders the person discharged or released on probation, La. Code Crim. Proc. art. 657.1, and there may be NGRI acquittees currently at ELMHS who are so qualified. There are similar mechanisms for the release of those on pretrial detention or who have been found irrestorably incompetent. La. R.S. 28:56(A); *see also* La. Code Crim. Proc. arts. 312, 313. However, in each case, release depends on a state court ordering release after a contradictory hearing which, in turn, depends on the individual being qualified for release.

Plaintiffs here have not alleged that they are qualified for release into the community. The fact that others at ELMHS might theoretically be qualified to take advantage of CBI if Defendants were ordered to make it available does not give Plaintiffs standing to demand same. Whether Defendants' compliance with the ADA/RA/ACA by implementing CBI "would prevent future injury to *others* is irrelevant; plaintiffs seeking injunctive relief must show a continuing or threatened future injury to *themselves*." *Stringer*, 942 F.3d at 721 (citation omitted) (emphasis added). Here, Plaintiffs have failed to adequately allege that granting the relief they request would affect them since none of them are currently qualified for placement in the community by any court nor have they alleged that any treatment professional has recommend them for community release.

Relying on *Fisher v. Okla. Health Care Auth*., 335 F.3d 1175, 1181 (10th Cir. 2003); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 290-91 (E.D.N.Y. 2008); *Long v. Benson*, No. 4:08-CV-

26, 2008 WL 4571904, at *2 (N.D. Fla. Oct. 14, 2008); and the Department of Justice, Questions and Answers on the ADA's Integration Mandate and *Olmstead* Enforcement, Question 4, Plaintiffs argue that "courts and the DOJ recognize that any treatment professional, whether employed by the state or not, may be used to show that community placement is appropriate." (Doc. 64 at 11.) Here, Plaintiffs have failed to plead that any treatment professional, whether hired by the state, Plaintiffs, or a third party, currently recommend Plaintiffs for community placement. [11]

But more importantly, what Plaintiffs have failed to plead is not merely that some treatment professional has recommended them for community placement, but that the state court which ordered Plaintiffs committed to ELMHS has found that they are eligible under state law to be released to the community. It is important to repeat that the state court orders are based on a judicial finding that the NGRI acquittees are a danger to themselves or others and release of such a person presents a fundamentally different issue than whether an institutionalized patient would or would not benefit from community placement. Similarly, a significant factor that a state judge must consider in deciding whether to release a prisoner to the community, on bail, or to release one previously declared irrestorably incompetent is the potential danger to the public presented by the individual. Unless and until Plaintiffs can allege facts showing that one or more of them has met the requirements of state law for release into the community (or that the meeting of such requirements is imminent and not merely speculative), Plaintiffs' allegations fall short of what is required to demonstrate standing.

---

[11] Some courts have gone further and held that "*Olmstead* does not require, however, that a medical professional endorse Plaintiff's request for relief at the pleadings stage, if ever." *Schine by Short v. New York State Off. for People with Developmental Disabilities*, No. 15-5870, 2017 WL 9485650, at *6 (E.D.N.Y. Jan. 5, 2017), *report and recommendation adopted*, No. 15-5870, 2017 WL 1232530 (E.D.N.Y. Mar. 31, 2017). *But see Martin v. Taft,* 222 F. Supp. 2d 940, 972 & n.25 (S.D. Ohio 2002) (requiring plaintiffs to plead "that the state's professionals have determined the plaintiffs are qualified for community-based care, or ... facts from which it may be inferred that the determinations of the state's professionals are manifestly unreasonable."). It is not necessary for this Court to resolve this difference in the case law since Plaintiffs' lack of standing rests fundamentally on their ineligibility under Louisiana law to be released into the community without court order, a factor not present in these cases.

It is true that a "treatment professional" recommended Stelly, Erie, Amos, Robinson, and Campbell "for community-based treatment *in the past*." (*Erie*, Doc. 28, ¶¶ 7, 12; *Amos*, Doc. 14, ¶¶ 7, 12 (emphasis added).) (There is no similar allegation for McInnis and Smith.) However, Plaintiffs fail to allege that any treatment professional currently recommends any of the Plaintiffs for release into the community on any basis or that they are eligible for release under state law. Therefore, the alleged harm they suffered from Defendants not instituting community-based programs is conjectural and hypothetical, not actual or imminent. Plaintiffs have not shown "at least a 'substantial risk' that the injury will occur" to them from Defendants not instituting a community-based treatment program. *Stringer,* 942 F.3d at 721.

All Plaintiffs except Summers attempt to fill this hole by alleging that "[e]ven if [Plaintiff] does not have a current recommendation for community-based placement, his individual needs are not static and he will *likely* obtain a recommendation for community-based treatment in the future." (*Erie*, Doc. 28, ¶¶ 7, 12; *Amos*, Doc. 14, ¶¶ 7, 12; *Campbell*, Doc. 15, ¶¶ 7, 12, 17 (emphasis added).)  The Court agrees with Defendants that this bare-bones, factually unsupported allegation is inadequate to meet Plaintiffs' burden to sufficiently allege that the relief sought will redress Plaintiffs' alleged injury. Under controlling Louisiana state law, none of the Plaintiffs would be eligible for release into the community to take advantage of community-based programs without an order from the state court. Plaintiffs have alleged no facts to support their conclusory allegation that release (or even recommendation for release) is "likely" for any of the Plaintiffs. Nor have Plaintiffs alleged any facts to demonstrate that release or entitlement to release is "imminent" or that the alleged likelihood of such entitlement is "substantial."

> The party invoking federal jurisdiction bears the burden of proving standing. [*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547] The court at the pleading stage bases its decision on the allegations of the complaint, and the complaint must "clearly …

allege *facts* demonstrating" each element of standing. *Spokeo*, 136. S. Ct at 1547
(citing *Warth* [*v. Seldin*], 422 U.S.[490] at 518 [1975]).

*McNeal v. Louisiana Dep't of Pub. Safety & Corr*., No. 20-312, 2021 WL 359737, at *6 (M.D. La.

Feb. 2, 2021) (deGravelles, J.) (emphasis added); *E.B. v. Landry*, No. 19-862, 2022 WL 1144834,

at *8 (M.D. La. Ap. 18, 2022) (deGravelles, J.) (same). Plaintiffs' allegations that their future

eligibility for community release by the state courts is "likely" are conclusory and unsupported by

facts. That is not enough.

In *Matherly v. Andrews*, 859 F.3d 264, 268 (4th Cir. 2017), the plaintiff was serving a 41-

month sentence for possession of child pornography in the Federal Correctional Institution in

Butner, North Carolina. He was also civilly committed by a court in the Eastern District of North

Carolina as a sexually dangerous person. While awaiting his civil commitment hearing, that

plaintiff filed suit against Bureau of Prisons employees in their official capacities, challenging

various conditions of his confinement. The plaintiff in *Matherly* claimed, among other things, that

because of his status as a sexual offender, "his contact with prisoners 'could very likely' cause him

harm at some point in the future." *Id.* at 277.

> Such a claim, however, fails for lack of standing. To establish standing, Matherly
> "must show (1) an injury in fact, (2) a sufficient causal connection between the
> injury and the conduct complained of, and (3) a likelihood that the injury will be
> redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, —— U.S. –
> ——, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014) (internal quotation marks
> omitted). "To establish injury in fact, [Matherly] must show that he ... suffered 'an
> invasion of a legally protected interest' that is 'concrete and particularized' and
> 'actual or imminent, not conjectural or hypothetical.' " *Spokeo, Inc. v. Robins*, ——
> U.S. ——, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) (quoting *Lujan v.
> Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

> The purpose of the imminence requirement "is to ensure that the alleged injury is
> not too speculative for Article III purposes." *Clapper v. Amnesty Int'l USA*, 568
> U.S. 398, 133 S.Ct. 1138, 1147, 185 L.Ed.2d 264 (2013) (internal quotation marks
> omitted). The "threatened injury must be certainly impending to constitute injury
> in fact, and ... allegations of possible future injury are not sufficient." *Id*. (internal
> quotation marks omitted). Even liberally construed, the allegation about harm that

might befall Matherly at some point in the future is too speculative to support standing for a claim under the Fifth Amendment. Simply put, Matherly pleads no facts establishing that the harm is certainly impending.

*Matherly*, 859 F.3d at 277.

For purposes of standing, the fact that some of the Plaintiffs have been recommended for release in the past (and therefore were able at that time to take advantage of community-based treatment) is insufficient to show that Plaintiffs' alleged harm is actual, concrete, particularized and imminent and not merely speculative, conjectural, or hypothetical.

In *McNeal v. Louisiana Dep't of Pub. Safety & Corr*, *supra*, the plaintiff was convicted of a probation violation and sentenced to the Louisiana Department of Corrections' ("DOC") Steve Hoyle Intensive Substance Abuse Program at the Bossier Parish Correctional Center. 2021 WL 359737, at *1. However, he was transferred to Elayne Hunt Correctional Center ("EHCC") near Baton Rouge, where he was held at the Hunt Reception and Diagnostic Center ("HRDC"). *Id*. The plaintiff then served his entire sentence at HRDC, which was intended primarily for short-term inmate screening and did not allow inmates access to programs such as sports, hobby craft, educational programs, and substance abuse programs. *Id*.

The *McNeal* plaintiff sued DOC under the ADA and RA for, among other things, declaratory relief and a permanent injunction requiring Defendants to comply with the ADA and RA and to provide appropriate opportunities, accommodations, and services. *Id.* at *2. He asserted that his history of 25 arrests in the past 23 years was sufficient to meet the injury in fact requirement of standing because it provided a "reasonable probability" he would suffer the same harm in the future. *Id*. at *8. The Court found that " 'reasonable probability' is not the proper standard in determining whether a future injury meets the injury in fact requirement of standing. Rather, the proper standard requires the future harm to be 'certainly impending' or a 'substantial risk of harm.'

" *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. at 414 n.5). In finding that the plaintiff lacked

standing, the Court wrote:

> The injury must be "an invasion of a legally protected interest" that is "concrete
> and particularized" and "actual or imminent, not conjectural or hypothetical" for a
> court to confer Article III standing. *Lujan*, 504 U.S. at 560. "A plaintiff must show
> that "they face a palpable present or future harm, not harm that is 'conjectural or
> hypothetical.' " *Levy v. Louisiana Dep't of Pub. Safety & Corr.*, 371 F. Supp. 3d
> 274, 284 (M.D. La. 2019) (deGravelles, J.) (quoting *Perez*, 624 F. App'x at 183).
> "Past exposure to illegal conduct does not in itself show a present case or
> controversy regarding injunctive relief ... if unaccompanied by any continuing,
> present adverse affects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 95 (1983); see
> *Plumley v. Landmark Chevrolet, Inc.* 122 F.2d 308, 312 (5th Cir. 1997). "A plaintiff
> seeking injunctive relief based on an alleged past wrong must show that there is
> reason to believe that he would directly benefit from the equitable relief sought."
> *Mosley v. Midas Worthington, LLC*, No. 19-75, 2020 WL 113350, at *3 (M.D. La.
> Jan. 9, 2020) (deGravelles, J.) (internal citations omitted). "Past wrongs can be
> considered, however as evidence of an actual threat or repeated injury." *Perez*, 624
> F. App'x at 183. "Future injuries can provide the basis for standing, but they 'must
> be certainly impending to constitute injury in fact,' and '[a]llegations of possible
> future injury are not sufficient.' An injury based on a 'speculative chain of
> possibilities' does not confer Article III standing." *Barber v. Bryant*, 860 F.3d 345,
> 357 (5th Cir. 2017) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2012)).

*McNeal*, 2021 WL 359737, at *7.

Here, the best Plaintiffs have done is allege a future injury that is is speculative. They have

failed to show how the relief requested would redress their alleged injury. In conclusion, the Court

finds that Plaintiffs have failed in their obligation to sufficiently allege Plaintiffs' standing and

hence this Court lacks jurisdiction.

## V. *YOUNGER* ABSTENTION AND FAILURE TO STATE A CLAIM

Because this Court lacks jurisdiction, the Court need not—indeed, it may not—decide the

remaining issues raised in Defendants' *Motion*. *E.B. v. Landry*, No. 19-862, 2021 WL 1201667, at

*15 (M.D. La. Mar. 30, 2021) (deGravelles, J.); *Hotze v. Burwell*, 784 F.3d 984, 991 (5th Cir.

2015) (explaining that if a court determines that a plaintiff lacks standing, that court "do[es] not—

indeed, [it] *may* not—reach the merits of the parties' [constitutional] arguments.") (emphasis in original).

## VI.    AMENDMENT

When faced with defective allegations, the Court "should freely give a complainant ... leave to amend[.]" *McClellon v. Lone Star Gas Co.*, 66 F.3d 98, 103 (5th Cir. 1995) (citing Fed. R. Civ. P. 15(a) as grounds for allowing amendment to cure defective allegations in a pleading).

The Fifth Circuit has stated:

> It is provided ... by 28 U.S.C.A. § 1653 that: 'Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts.' The theory seems to be that 'if jurisdiction actually existed from the facts at the time when the complaint was filed, even though not properly pleaded, * * * the formal defect in the pleadings did not deprive the Court of jurisdiction at the time when the action was filed, if such defect was later corrected.' *Stern v. Beer*, 6 Cir., 200 F.2d 794, 795. Cf. *Finn v. American Fire & Causalty Co.*, 5 Cir., 207 F.2d 113, 115.

*Kaufman v. W.U. Tel. Co.*, 224 F.2d 723, 725 (5th Cir. 1955). Section 1653 "like rule 15(a) should be liberally construed." *Miller v. Stanmore*, 636 F.2d 986, 990 (5th Cir. 1981).

Here, even with a liberal interpretation, Plaintiffs' jurisdictional allegations are not supported by any facts indicating that their alleged future harm is anything other than speculative or that their injuries are likely to be redressed by a judgment of this Court. Their jurisdictional allegations are therefore defective. Nevertheless, rather than an outright dismissal of the complaint for failure to allege such facts, the Court should afford Plaintiffs an opportunity to allege or show that their injuries are traceable to conduct by Defendants and are redressable by this Court before their complaint is dismissed on these grounds. Thus, in the absence of any bad faith or undue delay on the part of Plaintiffs or undue prejudice to Defendants, they should be allowed an opportunity to amend. *Foman v. Davis*, 371 U.S. 178, 183 S. Ct. 227, 230 (1962); *see also Reece v. Hamm*,

No. 19-669, 2020 WL 5026862, at *9 (M.D. La. Aug. 25, 2020) (deGravelles, J.); *E.B. v. Landry*, 2021 WL 1201667, at *15.

In *Erie* (Doc. 25) and *Campbell* (Doc. 14), Plaintiffs were given "thirty days within which to file an amended complaint which clarifies [the issue of whether Plaintiffs were being held at ELMHS because of a finding that they were NGRI]" and were told: "Plaintiffs may also, if they choose, amend their complaint to address any of the other issues raised in Defendants' [original] motion [to dismiss]. If the Court later determines upon a second motion to dismiss that there are still deficiencies in the complaint that were raised in the Defendants' first motion to dismiss, the Court will not give Plaintiffs an opportunity to amend again." (*Erie*, Doc. 25 at 2; *Campbell*, Doc. 14 at 2.)

In *Amos*, for reasons which are unclear in the record, a similar order was not issued. However, in Plaintiffs' Unopposed Motion to Modify Scheduling Order and For Leave to File Amended Complaint (*Amos*, Doc. 12), the motion acknowledged the Court's order in *Erie* and *Campbell* and that the amended complaint was to "address any of the other issues raised in the defendants' motion to dismiss." (*Id*. at 2.) When the Plaintiff in *Summers* was given leave to amend his complaint, the cautionary language found in *Erie* and *Campbell*'s rulings was not included.

Thus, although Plaintiffs previously amended their complaints, they did not do so in response to a ruling by this Court assessing the standing issue. In addition, there may have been confusion created by the cautionary language which was included in some but not all of the orders allowing the amendments. Further, while Plaintiffs have not yet requested an opportunity to amend, the Court nonetheless has inherent power to order such an amendment. *See McClellon*, 66 F.3d at 100 (quoting the magistrate judge's *sua sponte* order requiring an amended complaint). The appropriate remedy when granting a motion to dismiss based on deficient pleadings is to grant the

complainant time to amend the complaint; if the complainant fails to do so, then the district court may strike the pleadings or dismiss the case. *McClellon*, 66 F.3d at 103; *Reece*, 2020 WL 5026862, at *9. Thus, in the interest of justice and of orderly procedure, the Court will allow Plaintiffs an opportunity to amend their complaint. *E.g. Neal v. State of Ga.*, 469 F.2d 446, 448-50 (5th Cir. 1972) (reasoning that the trial court should have allowed amendment under 28 U.S.C. § 1653).

However, the Court reminds counsel for Plaintiffs of their obligations under Federal Rule of Civil Procedure 11. Plaintiffs should be thoughtful of not only the good faith grounds of their amendment, but also judicial economy. If Plaintiffs do not believe that they can amend in line with Rule 11, it is incumbent upon Plaintiffs to admit same and avoid a waste of judicial resources.

In addition, the Court notes that six of the Plaintiffs have been found NGRI and another irrestorably incompetent. Yet, all Plaintiffs are bringing the claims in their own names. Any amended complaint shall clarify the capacity of each to bring the complaint in his own name or the suit should be brought in the name of the appropriate representative.

## VII.   CONCLUSION

Accordingly, for the reasons detailed above,

**IT IS ORDERED** that the *Superseding Motion to Dismiss All Cases for Lack of Subject Matter Jurisdiction and Failure to State a Cause of Action* (Doc. 57) filed by Defendants, State of Louisiana, through the Department of Health, and Courtney N. Phillips, the Secretary of the Louisiana Department of Health, is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs shall have twenty-eight (28) days in which to amend their operative complaints to cure the deficiencies detailed in this ruling, if they can. Failure to do so will result in the dismissal of the claims against Defendants with prejudice. Any

amended complaint shall clarify the capacity of each plaintiff to bring the complaint in his own name or the suit should be brought in the name of the appropriate representative.

    Signed in Baton Rouge, Louisiana, on <u>September 27, 2022</u>.


                                               _____

                                               **JUDGE JOHN W. deGRAVELLES**
                                               **UNITED STATES DISTRICT COURT**
                                               **MIDDLE DISTRICT OF LOUISIANA**